UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASMA FARHA, M.D.,

                Plaintiff,                          Case Number 14-14911

v.                                            Honorable David M. Lawson

COGENT HEALTHCARE OF
MICHIGAN, P.C. and
COGENT HEALTHCARE, INC.,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Asma Farha, a physician specializing in internal medicine, was terminated for cause from her employment with defendant Cogent Healthcare of Michigan, a group medical practice that furnished staffing services to hospitals. Cogent says it fired her because she complained about her schedule for two years and threatened to refuse to work when scheduled, clients and other physicians complained about her tardiness, and she provoked a blowup well-witnessed with her supervisor in the middle of a hospital. Dr. Farha disputes the charges of tardiness and contends that her termination violated her employment contract. She also contends that Cogent violated the Americans With Disabilities Act, the Family and Medical Leave Act, and the Michigan Whistleblower Protection Act. Cogent moves for summary judgment on all counts, arguing that it had just cause to fire Dr. Farha, and its reasons were not pretexts for a motive made illegal by any of the federal or state laws relied upon by the plaintiff. The Court heard oral argument from the parties on February 1, 2016, and now concludes that, except for the interference claims brought under the ADA and FMLA, fact questions preclude summary judgment. Therefore, the Court will

dismiss the ADA claim alleging failure to accommodate and the FMLA interference claim, and deny the motion in all other respects.

I.

Cogent Healthcare of Michigan is a group medical practice consisting of physicians who specialize in family practice and internal medicine. The practice also apparently provides staffing services, furnishing to hospitals physicians who specialize in hospital care, called "hospitalists." Cogent hired plaintiff Asma Farha on May 17, 2012. She signed an employment contract in which she agreed to render professional hospitalist medical services to patients of the hospitals with which Cogent contracts. The contract term was three years, but allowed either party to terminate without cause with 180 days advance notice. Either party could terminate for a breach of a contract term if it first gave notice and allowed an opportunity for cure. Cogent could terminate without notice for "conduct by the Employee which is reasonably considered by Employer to be unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of Employer or Hospital, including failure of Employee to work as scheduled and behavior by Employee that is disruptive or inappropriate." Cogent fired Dr. Farha under this latter section on September 29, 2014.

The contract expressly stated that Dr. Farha "may be required [to work] at night, on weekends, and holidays. Employee must be ready to commence Employee's services at the time(s) that Employee is scheduled for the same, it being understood by Employee that lateness will not be tolerated and all times are of the essence." The contract also specified that an employee may be "required to provide professional medical services at the Hospital twenty-four (24) hours a day, seven (7) days a week and, therefore, there may be instances when Employee is requested to work at unscheduled times and Employee agrees to be reasonably available to work unscheduled times."

-2-

Plaintiff Farha admitted that she never read the contract until this litigation was underway. She does acknowledge, however, that she understood she was required to work whenever she was scheduled, including nights, weekends, and holidays.

A. Scheduling Complaints

Dr. Farha's first assignment was at Allegiance Health Center in Jackson, Michigan. Her supervisor was Dr. Bency Mathai. She was assigned to work night shifts, swing shifts, and rounding shifts. The defendant reports that Farha's complaints about scheduling began at Allegiance. Cogent's contract with Allegiance ended, however, and Dr. Farha was then assigned to work shifts at ProMedica Bixby Hospital in Adrian, Michigan, and ProMedica Herrick Hospital in Tecumseh, Michigan. Initially, Dr. Thomas McKeon was Dr. Farha's supervisor at Bixby, but six months later in January of 2014, Dr. Stephen Bachmeyer took over supervision duties and Dr. McKeon stayed on as a physician.

Before transferring to Bixby, Dr. Farha was interviewed by Dr. Steven Evans, regional director of Cogent, and Sarah Susalla, regional vice president of Cogent. Physicians are not normally interviewed when simply transferring between hospitals within Cogent contracts, but they had heard complaints from Dr. Farha's former supervisor and decided they needed to conduct the interview. At this interview, Dr. Evans and Ms. Susalla addressed complaints of arguing over patient assignments, patient load, scheduling, and difficulty getting along with the team. They ultimately decided to transfer Dr. Farha to the Bixby program, but made clear that the program was understaffed and she would need to be flexible with her scheduling.

Dr. Farha says that she got along with Dr. McKeon at Bixby, but problems arose with scheduling when Dr. Bachmeyer took over. Cogent contends that Dr. Farha was chronically tardy

to begin her shifts, which the time records appear to substantiate.  According to Dr. Farha, Dr. Bachmeyer would change her schedule without notice.  She maintains that Dr. Bachmeyer would give her "heavy shifts."  She contends that all of the other physicians at Bixby and Herrick were given both night and day shifts at both hospitals.  She, however, was given only nights at Herrick, and only days at Bixby.  Farha believes that she was the only physician with whom Dr. Bachmeyer had a problem.

One particular conflict Dr. Farha had with Dr. Bachmeyer happened when Farha called to ask if someone could cover her Bixby shift because there was a storm that created hazardous driving conditions.  She asked if Dr. Bachmeyer or Dr. Carolyn Whatley (Regional Medical Director and Dr. Bachmeyer's supervisor), who both lived closer to Bixby hospital, could cover her shift because of the storm.  Dr. Bachmeyer allegedly said there was no physician to cover that night and Dr. Farha needed to make it to Bixby no matter what it took.  Dr. Farha states that she spent four hours traveling from Ann Arbor to Bixby, normally only a 50-minute drive, only to find out that when she reached the hospital Dr. Bachmeyer was there waiting for her.  Dr. Farha thought Dr. Bachmeyer should have covered her shift because it was too risky for her to drive.

The schedules for the Bixby/Herrick physicians typically would issue in three-month blocks, scheduling physicians seven days on and then seven days off.  Dr. Farha alleges that Dr. Bachmeyer was the only one who could modify the schedule, even though Dr. Farha would communicate with Melody Isaacson, Cogent's scheduler, who initially set and sent out the schedules.  Dr. Bachmeyer, on the other hand, maintains that he had absolutely no role in scheduling.

On February 25, 2014, Ms. Isaacson sent Dr. Farha an updated January-through-March schedule.  The update altered the schedule for the last week of March to accommodate a conflict that

-4-

Dr. Bachmeyer had. Farha's schedule apparently was changed from a mixed schedule of Herrick and Bixby shifts to a schedule of all Bixby shifts. She complained to Ms. Isaacson that the new schedule took away two days at Herrick, giving her the whole week at Bixby, which interrupted her plans made in reliance on the partial-Herrick schedule. During this time, the Herrick/Bixby staff had three unfilled full-time physician openings, which apparently was causing three doctors (Bachmayer, McKeon, and Farha) to do the work of six. Ms. Susalla noted that both Dr. McKeon and Dr. Bachmeyer also had complained about the scheduling at Bixby. Indeed, Dr. Bachmayer communicated his "rage" about the schedule to Ms. Isaacson. In the correspondence to Ms. Isaacson, Dr. Farha requested to have her two Herrick shifts back and objected to the schedule being changed without communicating with her beforehand. Both Dr. Bachmayer and Ms. Isaacson acknowledged the difficult times and expressed that it should be better in the future.

Dr. Farha retorted with conflicting information in her email response. First she expressed she was happy to have a "breather" at Herrick, but guessed that would not happen, indicating she would be working the assigned shifts at Bixby. And then shortly thereafter, she said "I want my schedule back. You can report me to higher ups, but I am not doing it because you or whoever changes my schedule whenever they like to." Ms. Isaacson understood this to mean Dr. Farha was not going to work her assigned shifts. Dr. Bachmeyer stepped in, telling Dr. Farha that he wanted to resolve this conflict and saying she was a fantastic doctor and that he valued her presence on the team tremendously. Dr. Farha ultimately worked the full week of Bixby day shifts.

Dr. Farha never received performance evaluations from Cogent, nor did she receive any kind of written reprimand or discipline. Cogent insists that Dr. Farha was confronted on several occasions about her chronic tardiness, but there is no documentation in her personnel file to support

that contention.  Furthermore, Dr. Farha maintains that she was only late three or four times, twice because she was in car accidents and one or two more times because of severe weather, which apparently included rain.  According to Dr. Farha, Dr. Bachmeyer acknowledged that the weather was the cause of her coming in late on those occasions.  Dr. Farha alleges that she often arrived early and would cover other doctors if they needed to leave early.  The time records do not entirely support that claim, however.  Cogent had an approved practice of adjusting schedules during transitions, whereby one physician could cover for another up to a few hours, which was done on a non-routine basis and was worked out among the physicians.  Cogent provided a "Shift Over/Under Hour Report" as proof of Dr. Farha's tardiness; however, the report shows only the hours physicians self-reported, which does not account for the informal agreements among the physicians or tardiness.  The report shows several instances of tardiness by Dr. Farha, but it also shows that she worked shifts for which she was credited with "extra" time.

Dr. Farha contends that she was never formally confronted about tardiness, but that Dr. Bachmeyer once told her that if she is going to be late, she must contact the hospital to inform them of her circumstances.  She acknowledges that Dr. Bachmeyer told her that they may have to cut her pay on days she is tardy to compensate the doctor who has to remain to cover for her.  According to the defendants, Dr. Whatley spoke to Dr. Farha about her tardiness and leaving the facility during times that she was scheduled to work.  But no such assertion is made by Dr. Whatley in the deposition transcripts excerpts provided.  For the most part, Dr. Whatley did not remember the details of her conversations with Dr. Farha.

B.  Medical Issue

In May of 2014, Dr. Farha suffered a detached retina.  While working on May 21 she realized there was something wrong with her vision.  She called Dr. Bachmeyer, who was in Chicago, and asked him to cover her afternoon shift so she could go to the emergency room.  He declined, so she called Dr. McKeon, who covered the remainder of her shift.  No ophthalmologist was at the emergency room, so Farha made an appointment with one the following morning.  She communicated that information to Ms. Isaacson and Dr. Bachmeyer.  When she later called Dr. Bachmeyer, she says that he told her, "You ruined my vacation," because he had to return from Chicago to cover her night shift on May 22.

There is a dispute over what happened next.  Dr. Bachmeyer allegedly said that since he was back in town, he would cover the rest of Dr. Farha's shifts that week.  Dr. Bachmeyer testified that Dr. Farha was at first uncertain whether she could work, and then told him she would not be able to work the rest of that week.  Dr. Farha asserts that she told Dr. Bachmeyer that she did not need coverage for the remaining five days, and later she complained to Dr. Whatley that Dr. Bachmeyer took five shifts from her.

As a result of her detached retina, Dr. Farha said she needed frequent visits to the ophthalmologist.  She requested Herrick shifts for the month of June in order to make her eye appointments.  But Dr. Farha's ophthalmologist sent an FMLA certification that stated she would need one treatment every two months, and occasionally for flare-ups.  He also stated that she should only drive during the day.  Farha testified, however, that when she saw a retina specialist shortly thereafter, she was told she would need frequent appointments in the month of June.  Dr. Farha never submitted certification to Cogent for that frequency of treatment.  Cogent scheduled Dr. Farha for

shifts at Herrick in the beginning and most of June, although she was given Bixby shifts toward the end of the whole month. Nonetheless, Dr. Farha stated that she was never denied time to attend her appointments, and she was able to attend all of them.

Cogent further attempted to accommodate Dr. Farha's driving restriction by offering to provide her with hotel accommodations adjacent to the hospital along with food reimbursement if she had to stay over night. However, Dr. Farha rejected that offer as not reasonable because she has four small children and preferred not to be away from home without an overnight babysitter. Dr. Farha countered by suggesting that Cogent reimburse her for a driver instead. After some negotiation, Cogent and Dr. Farha finally agreed that Cogent would pay for mileage for her driver. When asked whether she thought this was reasonable, Dr. Farha responded "yes." She acknowledged that Cogent paid for the mileage expense and that it worked out for her.

Unum, which handled all of Cogent's requests under the FMLA, received Dr. Farha's initial FMLA medical certification, but Dr. Farha did not cause another one to be filed by any of her physicians. Dr. Farha maintains that she could not provide documentation for May 23 through 26 because she was able to work those days. Dr. Farha stated in an email that she could get documentation for May 22 and 23; however, the record does not indicate that she ever produced the documentation.

### C.  Whistleblower Allegations

At some point, Dr. Farha sent an email to Dr. Whatley complaining that Dr. Bachmeyer was making mistakes during admissions by starting the wrong treatments on patients. The last time Dr. Farha contacted Dr. Whatley was the day before her termination in September 2014, concerning a heart attack patient who had not been attended to. Dr. Bachmeyer, during the night shift, allegedly

-8-

decided not to treat a patient and when Dr. Farha came in the next morning the patient had to be transported to Toledo Hospital because 12 to 18 hours elapsed after the patient had a heart attack and no treatment had been given. Dr. Farha allegedly called Dr. Bachmeyer and told him, "I'm going to report this incident, it's not acceptable, I'm going to report it to higher authorities." Dr. Bachmeyer allegedly responded, "I don't think you will be able to." According to Dr. Farha, the "higher authorities" were the hospital administration and the State of Michigan, although no one was ever contacted, and Dr. Farha never elaborated on her intentions.

Dr. Farha says that she never reported the incident to the state because she believed that she needed patient details, which she did not have because she was fired and escorted out of the building the following day.

### D.  Dr. Farha's termination

It appears that discussions to terminate Dr. Farha began as early as March of 2014. However, the decision to terminate Dr. Farha allegedly began taking shape a few weeks before her actual termination in September 2014. According to Ms. Susalla, the ultimate decision to terminate rested with Cheryl Slack, the chief of human resources and physician services officer. There is some disagreement among the witnesses on the point, but it appears that protocol called for Dr. Whatley and Ms. Susalla to determine who would be terminated, based in part on feedback from Dr. Bachmeyer, and Ms. Slack had veto power over that decision. Slack testified that Ms. Susalla recommended that Dr. Farha be terminated because of a repeated and ongoing pattern of tardiness at the beginning of her shifts, arguing and refusing to work as scheduled, refusing or being difficult about coming from Herrick to support the team at Bixby, and not wanting to do face-to-face hand-offs with other physicians at the ends of shifts.

Ms. Susalla also alleges that Dr. Farha complained to Cogent's clients and to hospital employees and community providers about the company and her medical director. According to Ms. Susalla, Dr. Whatley sat down with Dr. Farha multiple times to address her tardiness, although there are no notes in Dr. Farha's personnel file to reflect those meetings, nor was her tardiness tracked formally. Dr. Whatley also recommend that Dr. Farha should be terminated because of tardiness, not being a team player, not covering Dr. Bachmeyer's patients, and inappropriate conversations at the nursing station. Ms. Susalla agreed that simply complaining about the schedule would not be grounds for termination. And Cogent never kept track of dates on which Dr. Farha allegedly refused to work, and Susalla could not identify those dates. However, she asserts that Dr. Farha would not work Monday nights and Cogent allegedly gave in to that demand.

According to Dr. Bachmeyer, he previously had argued against terminating Dr. Farha, in part because "she was an extremely good physician." However, Dr. Bachmeyer testified that Dr. Farha was often tardy, a conclusion, he asserted, that was based on his inquiries to the nursing staff. He said that he had more than ten conversations with Dr. Farha concerning her tardiness. But he admitted that he never formally disciplined her for any of her behavior. Dr. Bachmeyer, however, did disciplined another doctor, Dr. Muhammad Abdullah, for being tardy, and Dr. Abdullah is still employed by Cogent. Dr. Bachmeyer stated that "[Dr. Farha] did not get fired because of tardiness from — by me."

On August 15, 2014, Dr. Bachmeyer sent an email to Dr. Farha, with copies to Ms. Isaacon, Ms. Susalla, and Dr. Whatley, inferring that she had lied to a colleague. The circumstances of the incident are not clear, but it appears that Dr. Farha was to report to Bixby one evening (typically at 7 p.m.), but she contacted a colleague at 6:15 p.m. and said she was already in a meeting at Bixby

-10-

and to "go ahead and leave the beeper on the desk and go."  The colleague stayed until 7:15 p.m. and then left the beeper on the desk, but as he was leaving the building he saw Dr. Farha pulling into the parking lot.  The colleague stated that she had been tardy multiple days that week, and Dr. Bachmeyer stated that he had witnessed one of those days where she was 10 minutes late.  In his email, Dr. Bachmeyer admonished her for the tardiness, the possible lie, and her professional responsibilities.  In reply, Dr. Farha vehemently denied the sequence of events, insisting that instead, she called her colleague at 6:40 to say that she was around and would take calls on her phone, so he could leave the pager on the desk.  A later email by Dr. McKeon corroborates Dr. Farha's accounting of events to some extent.  Dr. McKeon wrote that as he was leaving that night via the physician's exit, he stopped Dr. Farha between 7:10 and 7:15 to discuss some admissions.  He mentions that during that time Dr. Farha answered a couple of calls from the hospital on her cell phone.  Dr. McKeon makes no mention of her *arriving* at that time.  Dr. Farha admitted that she was 10 minutes late on another day that week due to rain, but rejects the rest of the allegations by Dr. Bachmeyer.

Dr. Farha had an altercation with Dr. Bachmeyer at Bixby Hospital, which provided another basis for her termination.  According to Dr. Farha, Dr. Bachmeyer had assigned her a critical patient at Bixby while she was still at Herrick.  She says that the nurses asked Dr. Bachmeyer to look at the critical patient while Bachmeyer was at Bixby, but he said he had transferred the patient to Dr. Farha.  The nurses told Dr. Bachmeyer that the patient could not wait for a couple of hours until Dr. Farha arrived from Herrick, but he supposedly responded that the patient was not his.  Dr. Farha contacted Dr. Bachmeyer and asked him to go see the patient, and complained that he cannot assign a critical patient to her while she is at another facility.  By the time Dr. Farha made it to Bixby, the

-11-

patient had expired.  That apparently prompted an altercation between Dr. Farha and Dr. Bachmeyer in front of other employees at a nurses's station.  This event instigated a detailed email from Dr. Bachmeyer to Dr. Whatley about what had transpired.  After that incident, Tracey Bowers, Cogent's human resources manager, and Cheryl Slack decided to terminate Dr. Farha *without cause* on September 2, 2014.

Dr. Farha points to evidence that another physician, Dr. Tresa Pasam, would act inappropriately at the nurse's station, yelling at nurses, slamming charts, and had a volatile temper, and yet she was never terminated.  Ms. Sussalla described Pasam's behavior as extreme.  Dr. Pasam was given both a verbal and written warning about her unprofessional behavior.  The written warning was reflected in her personnel file and was listed as her first of potentially three warnings, and was signed by Dr. Whatley.  Dr. Pasam was transferred from Bixby to another facility and eventually allowed to resign in April of 2014.

Dr. Farha was terminated the day after her blowup with Dr. Bachmeyer at the nurse's station at Bixby.  The termination letter, dated September 29, 2014, recites the contract language that justifies immediate termination without notice — that is, for unprofessional and unethical conduct — without elaboration or reference to any factual incidents, indicating that the termination was for cause.  There is no indication in the record why the decision to terminate Dr. Farha *without cause* was changed to *for cause*.  It appears that the termination letter was still being finalized and the exact reason for Dr. Farha's termination was being decided until shortly before the termination meeting.

E.  Procedural history

Dr. Farha filed an EEOC charge and received a right to sue letter on February 19, 2015.  She filed her complaint, amended once, alleging breach of contract (Count I), sex discrimination (Count II), disability discrimination under the ADA (Count III), violation of the Family and Medical Leave Act (Count IV), and violation of the Michigan Whistleblower Protection Act (Count V).  The parties agreed to dismiss the sex discrimination count. The defendants have moved for summary judgment on the remaining counts.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b).  Such a motion presumes the absence of a genuine issue of material fact for trial.  The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in

-13-

order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital*, 350 F.3d at 546 (quoting *Anderson*, 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

-14-

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### A. Breach of Contract Claim

The breach of contract claim is brought under Michigan law, which governs this claim. The defendant argues that the employment contract explicitly requires the physician to work her assigned shift, emphasizing that lateness "will not be tolerated." The defendant reasons that the unrefuted evidence establishes that Dr. Farha continuously attempted to dictate her schedule and despite being counseled on tardiness continued to be tardy, and therefore cause for termination is established on this record. Dr. Farha disputes that the record establishes that she was chronically late, and she contends that the contract does not define what is meant by "unprofessional" conduct, so a for-cause termination was not justified. She argues that she is entitled to recover because Cogent terminated her for cause without reasonable justification and refused to pay her the required six months of pay for a no-cause termination.

Under Michigan law, a plaintiff claiming breach of contract must first establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304, 307 (1990). A valid contract exists when "(1) parties [are] competent to contract, (2) [there exists] a proper subject matter, (3) a legal consideration [is present], (4) mutuality of agreement [exists], and (5) mutuality of obligation [exists]." *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58, 60 (1991). If the plaintiff establishes the existence of a contract under Michigan law, the plaintiff must

-15-

"then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breach caused the plaintiff's injury." *In re Brown*, 342 F.3d 620, 628 (6th Cir.2003) (construing Michigan law) (citing *Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)).

In Michigan, employment is presumed to be "at will," that is, terminable at the will of the employee or the employer. *Lynas v. Maxwell Farms*, 279 Mich. 684, 687, 273 N.W. 315, 316 (1937). However, it is well recognized that employers may enter into contractual relationships with their employees that set conditions and limitations on the employer's ability to fire an employee. Those provisions may include "a provision forbidding discharge absent just cause," and "an express agreement . . . regarding job security that is clear and unequivocal." *Lytle v. Malady*, 458 Mich. 153, 164, 579 N.W.2d 906, 911 (1998).

"The employer's standard of job performance can be made part of the [employment] contract. Breach of the employer's uniformly applied rules is a breach of the contract and cause for discharge." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 624, 292 N.W.2d 880, 897 (1980).

> Where an employer has agreed to discharge an employee for just cause only, its decision to terminate the employee is subject to judicial review. The jury decides as a matter of fact whether the employee was discharged for cause. While the jury may not substitute its opinion for that of the employer's, it may determine whether the employee committed the specific misconduct for which [s]he was fired, whether the firing was pretextual, whether the reason for discharge amounted to good cause, or whether the employer was selectively applying the rules. It is not enough that an employer acted in good faith or was not unreasonable.

*Renny v. Port Huron Hosp.*, 427 Mich. 415, 429, 398 N.W.2d 327, 335 (1986).

Cogent argues in its motion brief that its stated reasons for terminating Dr. Farha for cause were her failure "to work as scheduled and behavior by Employee that is disruptive or

-16-

inappropriate." That explanation does not appear in the termination letter. Dr. Farha contends that she was only tardy three or four times because of car accidents and weather. Cogent maintains that she was tardy frequently and put a great burden on the medical staff because of her behavior. Dr. Farha's personnel file does not contain any written warnings, and there is minimal documentation addressing her tardiness. Dr. Farha asserts that she and Dr. Bachmeyer had only one conversation regarding tardiness. Cogent asserts Dr. Farha was confronted more than a dozen times, although there are no written records reflecting those conversations. There is a significant difference between reporting late to work three or four times because of external circumstances and a pattern of tardiness as Cogent alleges. A genuine fact dispute exists on this question.

Furthermore, it is not clear from the termination letter whether the "disruptive behavior" was strictly due to tardiness or other encounters Dr. Farha had with Dr. Bachmeyer, such as the one at the nurses's station. However, even if the nurses's station incident was a motivating factor, there is evidence in the record that at least one other physician was not terminated for arguably more severe behavior. And after the nurses's station encounter, the decision to terminate Dr. Farha was without cause, not for cause. A jury could determine that Cogent was not uniformly applying its rules and therefore did not have just cause to terminate Dr. Farha. *See Toussaint*, 408 Mich. at 624, 292 N.W.2d at 897.

Dr. Farha's argument that no one can identify who made the decision to terminate is not persuasive. It is clear that Ms. Slack, Ms. Susalla, and Dr. Whatley had the authority to terminate Dr. Farha's employment, and all concurred in the termination. What is not clear is when or why the decision to terminate Dr. Farha without cause changed to for cause. A jury could conclude that the

-17-

sudden change was not reasonable and Dr. Farha's conduct did not amount to violation of the employment contract.

The parties provide very different accounts of Dr. Farha's employment with Cogent.  Under Dr. Farha's account, a jury could conclude reasonably that she was not terminated for cause.  There is no dispute that Cogent could have terminated Dr. Farha without cause, but that would have required notice 180 days before the termination.  Genuine issues of material fact remain in this case with respect to whether Dr. Farha was indeed arriving late for work, and whether her other conduct rose to a level warranting termination for cause.  Summary judgment on this count is not warranted.

## B.  ADA Claim

Plaintiff Farha contends that Cogent violated her rights under the Americans With Disabilities Act by refusing to engage in an interactive process with her to arrive at an accommodation addressing her vision problem, and terminating her in retaliation for seeking the accommodation.

### 1.  Failure to Accommodate

A plaintiff must prove five elements to sustain a claim for violating the ADA by denial of a reasonable accommodation.  She must show that (1) she is "disabled," as the ADA defines the term; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) her employer knew or had reason to know of her disability; (4) she requested a reasonable accommodation; and (5) the employer did not provide the accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir. 1997)), *overruled on other grounds by Gross v. FLB Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009), as stated in *Scheich v. Tecumseh Pub. Schls.*, 766 F.3d 523, 530 (6th Cir. 2014)); *see also Aldini v. Kroger Co.*

*of Michigan*, --- F. App'x ---, 2015 WL 5827559, at *2 (6th Cir. Oct. 7, 2015) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011)).

The Department of Labor's regulations implementing the ADA state that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."  29 C.F.R. § 1630.2(o)(3).  The purpose of that process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Ibid.*  The Sixth Circuit has explained that "[e]ven though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (footnote and citations omitted).  "The refusal to give [an employee a] specific requested accommodation does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations."  *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 133 (1st Cir. 2014); *see also* 29 C.F.R. § 1630, App. § 1630.9 (explaining that an employer may choose between reasonable accommodations).

A reasonable accommodation may include "[s]hifting marginal duties to other employees who can easily perform them."  *Rorrer v. City of Stow*, 743 F.3d 1025, 1044 (6th Cir. 2014). However, shifting an employee's essential functions to other employees is not recognized as a reasonable accommodation.  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 928 (6th Cir. 2013) (citing *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632–33 (6th Cir. 1999)).

The employment contract states that an employee may be required to work at night and may be "required to provide professional medical services at the Hospital twenty-four (24) hours a day,

-19-

seven (7) days a week and, therefore, there may be instances when Employee is requested to work at unscheduled times and Employee agrees to be reasonably available to work unscheduled times." That language suggests that working at nights was an essential job function. However, even assuming working night shifts were marginal tasks that could be easily performed by Dr. Bachmeyer or Dr. McKeon, Cogent chose between reasonable accommodations when they offered to lodge Dr. Farha at a hotel, and later when agreeing to pay for her driver expenses. *See* 29 C.F.R. § 1630, App. § 1630.9.

Dr. Farha argues that she had trouble communicating with Cogent personnel about addressing her employment accommodation needs that arose from her vision issues. But the undisputed record shows that the parties engaged in the interactive process, negotiated, and determined reasonable accommodations for Dr. Farha's short-term and long-term limitations. Dr. Farha requested all day shifts at Herrick for the month of June 2014. Her medical documentation only indicated she would need follow-up appointments every other month. Later she found out she would need as many as two appointments a week, although she never provided documentation to Cogent supporting that request. Nonetheless, she admits that most of her shifts in June were at Herrick and she was able to keep all of her appointments. Further, Dr. Farha stated that paying mileage for a driver to accommodate her limited night vision was reasonable and that it met her needs. It appears beyond dispute that Cogent engaged in the interactive process in good faith and that the process achieved the desired results. Therefore, the defendants are entitled to summary judgment on the ADA claim based on failure to accommodate or engage in the interactive process.

-20-

2.  Discrimination

Dr. Farha also contends that Cogent discriminated against her by firing her for seeking accommodations to her schedule because of her vision disability.  Under Title I of the ADA, employers may not "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees."  42 U.S.C. § 12112(a).  A plaintiff may establish discrimination by direct or circumstantial evidence.  *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004).  If, as here, the plaintiff fails to offer any direct evidence of discrimination, the court applies the three-step legal analysis set forth in *McDonnell Douglas Corp. v. Green*. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004).  Under the *McDonnel Douglas* structure, "the employee has the initial burden of establishing [her] *prima facie* case; if [s]he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

To establish a *prima-facie* case of discrimination under the ADA a plaintiff must show that "(1) [s]he is disabled, (2) [s]he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) [s]he suffered an adverse employment action because of his disability."  *Demyanovich v. Cadon Plating & Coatings*, L.L.C., 747 F.3d 419, 433 (6th Cir. 2014); *but see Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (recognizing confusion in the Sixth Circuit and confirming the *prima facie* case for discrimination under the ADA is a five-part test).  The Sixth Circuit has recognized that the disability need not be the *sole* reason for the adverse action, although the plaintiff must establish that her employer acted "because of" her disability, that

-21-

is, "but for" causation. *Lewis v. Humboldt Acquisition Corp. Inc.*, 681 F.3d 312, 318 (2012) (en banc) (citing *Gross v. FBL Financial Services*, 557 U.S. 167, 177-78 (2009).

For this motion, Cogent accepts the idea that Dr. Farha was disabled under the ADA and she was able to perform her duties as a physician with an accommodation. The point of tension is whether Dr. Farha was terminated because of her disability. Dr. Farha's argument centers around Cogent's decision to terminate her, because of scheduling issues, which after June 2014 were attributable in part to her detached retina.

Dr. Farha alleges that Dr. Bachmeyer commented that Dr. Farha "ruined his vacation" in response to cutting short his vacation to cover one of her shifts when her retina detached. Moreover, it appears that several of the physicians routinely complained about the scheduling, including Dr. Bachmeyer, who communicated to Ms. Isaacson his "rage" about the scheduling. Cogent's argument is that Dr. Farha was not terminated for one reason; rather she was terminated for the aggregate of its stated reasons for terminating her employment. Indeed, Cogent has offered deposition testimony that suggests that Cogent was considering terminating Dr. Farha's employment as early as March of 2014. But the actual decision was not made until September of 2014, well after Dr. Farha's medical issues began. Nonetheless, because scheduling and tardiness were among the reasons given for terminating Dr. Farha, she has established a *prima facie* case of discrimination under the ADA.

For its legitimate, non-discriminatory reasons for its actions, Cogent states that Dr. Farha was repeatedly tardy, attempted to dictate her own schedule, would not cover Dr. Bachmeyer's patients, and had behavioral issues. Cogent's burden is "'one of production, not persuasion.'" *Wheat v. Fifth*

-22-

*Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  Cogent has met its burden of production.

Dr. Farha must then show that Cogent's stated reasons were pretextual, which she may do by "showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate h[er] [termination], or (3) that they were insufficient to motivate discharge." *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 651 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012).  Dr. Farha contends that she was only tardy three or four times and that many of the other physicians complained about scheduling.  Dr. Bachmeyer more than once commented that Dr. Farha is an excellent physician and there does not appear to be any support to the contention that she refused to cover Dr. Bachmeyer's patients.  And finally, although she does not agree that she has behavioral issues, Dr. Farha has offered documentation that shows another physician with behavioral issues was not terminated for arguably more severe conduct.  A reasonable jury could determine that Cogent's stated reasons were pretextual.  Summary judgment on the plaintiff's discrimination theory under the ADA will be denied.

### C.  FMLA Claims

The plaintiff contends that Cogent violated her rights under the FMLA by interfering with her right to take FMLA leave following her detached retina episode and firing her for her attempts to take FMLA leave.  The Sixth Circuit has recognized that the *McDonnell Douglas* burden shifting analysis applies to both interference or retaliation claims under the FMLA.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

-23-

1.  Interference

The FMLA entitles qualifying employees to twelve weeks of unpaid leave each year if an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1); *see also* 29 C.F.R. § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act."). Employers who violate section 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1).

"To prevail on an interference claim, a plaintiff must establish that (1) [s]he is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of [her] intention to take leave; and (5) the employer denied the employee FMLA benefits to which [s]he was entitled." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (internal marks and citations omitted) *superseded on other grounds by* 29 C.F.R. § 825.302(d); *see also Srouder v. Dana Light Axle Mfg.*, LLC, 725 F.3d 608, 614–15 (6th Cir. 2013) (recognizing change in law).

An employee must give her employer prompt notice of an intention to take FMLA leave, but in the case of "a medical emergency, notice must be given as soon as practicable." 29 C.F.R. § 825.302(a), (b). "An employer has the option of requesting (in writing) that an employee provide medical certification that she is suffering from a serious medical condition." *Wallace v. FedEx Corp.*, 764 F.3d 571, 587-88 (6th Cir. 2014) (citing 29 C.F.R. § 825.305(a)). "An employee has an

-24-

obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying." 29 C.F.R. § 825.302(c).

"When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days." 29 C.F.R. § 825.300. Failure to follow the FMLA notice requirements may constitute an interference with FMLA rights. 29 C.F.R. § 825.300(e). However, "'[e]mployees seeking relief under the interference theory must also establish that the employer's violation caused them harm.'" *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (internal marks omitted) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).

Dr. Farha contacted Dr. Bachmeyer and made Cogent aware of her medical condition as soon as it happened. When Dr. Bachmeyer relieved her from work for five days at the end of May, it was clear that Dr. Farha may be entitled FMLA leave for a qualifying reason. At that point, Cogent was obligated to provide notice of her rights under the FMLA. Dr. Farha's second communication on May 29, 2014 triggered the proper response from Cogent and it supplied the necessary notice moving forward. The failure of Cogent to provide notice initially, however, did not result in harm to Dr. Farha. It is undisputed that she attended all of her appointments and was accommodated for all of her medical needs. Furthermore, Cogent is entitled to request medical certification, which it eventually received and in turn provided the appropriate leave under the FMLA. Dr. Farha suffered

economic harm from being removed from the schedule for five days, but that could not be tied to any lack of notice.

Dr. Farha further argues that Cogent interfered with her FMLA rights by delaying the decision on her FMLA leave, requesting additional certification, and conveying false information internally.  However, all of Dr. Farha's arguments fail for the same reason.  She cannot show that she suffered harm by Cogent interfering with her FMLA rights.  Therefore, summary judgment will be granted on Dr. Farha's FMLA interference claim.

## 2.  Retaliation

To establish a *prima facie* case of FMLA retaliation, a plaintiff must show that "'(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.'"  *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).

The parties focus their arguments on whether Dr. Farha presented sufficient evidence to show a causal connection between her request for FMLA leave and the adverse employment action. Dr. Farha's argument is that other Cogent employees who had complained about the schedule and engaged in unprofessional behavior were not terminated.  Dr. Farha's termination was, in part, because of scheduling issues.  Although prior to Dr. Farha's request for FMLA leave she was having scheduling problems with Cogent, Dr. Farha argues it was more severe after her request for FMLA

leave. Similar to Dr. Farha's claim of discrimination, one of Cogent's reasons for terminating her revolved around scheduling difficulties. After May 21, 2014, the scheduling problems were due to receiving treatment for her detached retina.

It is clear that Cogent had pervasive scheduling difficulties and was chronically understaffed, and that frequent absences by Dr. Farha could cause problems for Cogent. A reasonable jury could conclude that Dr. Farha was indeed treated differently than other physicians and that Dr. Farha was retaliated against for requesting FMLA leave. Therefore, Cogent's motion for summary judgment will be denied on Dr. Farha's claim of FMLA retaliation.

### D. Whistleblower Claim

Dr. Farha accuses Cogent of violating Michigan's Whistleblower Protection Act by firing her after she threatened to report Dr. Bachmeyer's failure to treat a heart attack patient to "higher authorities." Under that Act, "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee . . . because the employee . . . reports or is about to report . . . a violation or a suspected violation of a law . . . to a public body." Mich. Comp. Laws § 15.362. "'Employer' . . . includes an agent of an employer and the state or a political subdivision of the state." Mich. Comp. Laws § 15.361. To establish a *prima facie* case under this statute, a plaintiff must show that "(1) [she] was engaged in protected activity as defined by the act, (2) [she] was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. Gen. Motors Corp.*, 469 Mich. 177, 183-84, 665 N.W.2d 468 (2003) (citing *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210 (1998). "A protected activity under the act consists of '(1) reporting to a public body a violation of a law, regulation, or rule, (2) being about to report such a violation to a public body, or (3) being

asked by a public body to participate in an investigation.'" *Manzo v. Petrella*, 261 Mich. App. 705, 714, 683 N.W.2d 699, 704 (2004) (quoting *Chandler*, 456 Mich. at 399)).

The Michigan Whistleblower statute does not require a plaintiff to actually report a suspected violation. *Shallal v. Catholic Social Svcs. of Wayne County*, 455 Mich. 604, 615-616, 566 N.W.2d 571, 577 (1997). The statute is satisfied if the plaintiff was "about to report" the violation. *Id.* at 616, 566 N.W.2d at 577. To satisfy the "about to report" element, an employee must show "by clear and convincing evidence that he or she . . . was about to report, verbally or in writing." Mich. Comp. Laws § 15.363(4). An employee who is "about to report" a violation is one who "is on the verge of" doing so. *Shallal*, 455 Mich. at 612, 566 N.W.2d at 575.

Cogent repeatedly points out that Dr. Farha never made a report to a public body. However, as explained above, she may proceed under the "about to report" part of the statute. Dr. Farha stated that she told Dr. Bachmeyer, "I'm going to report this incident, it's not acceptable, I'm going to report it to higher authorities." Dr. Bachmeyer allegedly responded, "I don't think you will be able to." According to Dr. Farha, the higher authorities were the hospital administration and the State of Michigan. Dr. Farha contends that she was unable to report the activity to the State of Michigan because she was terminated the next morning, before she could get documentation to support the alleged violation. Dr. Farha has a high burden, but a fact question remains whether she was "about to report" Dr. Bachmeyer's alleged activity to the State of Michigan.

Cogent also argues that Dr. Farha cannot establish a causal connection between her protected activity and her termination. The plaintiff must show more "than a temporal relationship between the protected activity and defendants' adverse employment action." *Ibid.* (citing *West v. Gen. Motors Corp.*, 469 Mich. 177, 665 N.W.2d 468 (2003). It points out that the decision to terminate

-28-

Dr. Farha happened several weeks before the protected activity, and therefore there was no causal link. What Cogent fails to consider, however, is that the decision had been made to terminate Dr. Farha *without cause*. After Dr. Farha threatened to report Dr. Bachmeyer, he allegedly said , "I don't think you will be able to," from which a reasonable factfinder could infer that Bachmeyer knew that Farha was on her way out. But the next day, Cogent terminated Dr. Farha *for cause*. The adverse action in this case is not merely the termination, but the unexplained decision to terminate Dr. Farha for cause and avoid the contractual 180-day notice requirement. Cogent was aware of the threat through its agent Dr. Bachmeyer, who was Dr. Farha's supervisor and had input on whether to terminate her.

A jury could reasonably conclude that Cogent's sudden decision to terminate Dr. Farha for cause, evidenced by the last minute drafting of her termination letter, and the change from without cause to for cause is sufficient to show Cogent knew about the threat and acted upon it. The plaintiff has shown more than mere temporal proximity and a jury could reasonably infer a causal link between her protected activity and the adverse action. Summary judgment is not appropriate on this count.

III.

The plaintiff has not offered evidence sufficient to establish a genuine fact question on her ADA accommodation claim or her FMLA interference claim. However, fact questions preclude summary judgment on the remaining claims in her amended complaint.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #20] is **GRANTED IN PART AND DENIED IN PART**.

-29-

It is further **ORDERED** that the failure to accommodate claim under the ADA in Count III and the FMLA interference claim in Count IV of the amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 29, 2016

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 29, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI

---